Good morning, your honors. May it please the court. My name is Christopher Wilmes, and I represent the plaintiff, Pelham, in this case. Warrants in this case were dragnets. It required Western Union to detain every single person-to-person money transfer at or above certain dollar thresholds directed to the state of Arizona or Sonora, Mexico, from any number of states, for weeks at a time. As a result of this incredibly broad seizure warrant program, the state of Arizona collected some $9 million, which it used to self-finance and continue this program. Despite the common criteria used in these warrants and the complete absence of any constitutionally adequate notice procedures, the district court denied plaintiff's motion for class certification, and it dismissed the claims entirely, including claims for injunctive relief, on the grounds of absolute immunity. I'd like to try to explain to you why the district court erred in making those rulings, and I'd like to begin, if I may, with the absolute immunity issue. There are three principal reasons why the district court erred in granting absolute immunity in this case. First and foremost, Mr. Holmes personally served the warrants on Western Union. He did so by fax and by mail. Act of serving a warrant is a classic police function. Police do it every day, and they're only entitled to qualified immunity when they do so. Indeed, if you look at the Arizona Forfeiture Statute, this is Section 13-4305, expressly provides that a seizure for forfeiture is to be performed by a peace officer. Mr. Holmes testified in his deposition that he was not a peace officer when he served these warrants, and clarified that the phrase peace officer is synonymous with police officer. Because this is an NREM proceeding rather than an N-persona proceeding, does that change things? Because this is the equivalent of serving a complaint. Let me, uh, act of serving a complaint? Oh, it's an assertion of service. It's an assertion of service, but it's an assertion of jurisdiction by the state when they tell Western Union they're going to seize these assets, and it gives them NREM jurisdiction. It may be a necessary prerequisite to a forfeiture proceeding, but the Supreme Court has made clear that a necessary prerequisite to a criminal proceeding does not mean that it's automatically cloaked with absolute immunity. This is the Kalina case, right? The prosecutor undertook an act that was necessary for the initiation of a criminal proceeding. He or she signed an affidavit that was attached to a criminal information and submitted to court. But nevertheless, the Supreme Court said that that necessary step was not cloaked with absolute immunity because it was not a prosecutorial function. Here, Mr. Holmes' act, serving a warrant, informing Western Union that it must detain these money transfers, was an act that any police officer could have performed. And it was, and it states that in the Arizona statute that I quoted earlier. And the Supreme Court has recognized a common law tradition affording absolute immunity for prosecutorial acts that are intimately involved in a imminent or pending criminal judicial proceeding. But again, serving a warrant is simply not a prosecutorial act. If the prosecutor in Kalina, again, is only given qualified immunity for something so closely related to judicial proceedings as signing an affidavit which was required to be attached to that information, then Mr. Holmes' act here, which is farther removed from the judicial process, serving a warrant, should only be given qualified immunity as well. Now let me move on to the second reason that absolute immunity should have been denied in this case. And that's because these seizure warrant programs were undoubtedly investigative in nature. Mr. Holmes testified that the warrant program was supposed to take place in two phases. In the first stage, he seized large numbers of money transfers all at once, hundreds at a time. And understanding that many of these transfers were unassociated with any type of criminal conduct, he then, they created these call centers where senders and receivers of money could speak with law enforcement and try to convince them that the purpose of their transfers was perfectly legal. Only after completing this investigation, and that's what it was, law enforcement was there a final decision about whether to undertake forfeiture proceedings. If Holmes' characterization of these warrants is accurate, then this case is on all fours with this Court's decisions in KRL, in Gensler, and Outkitt v. Ashcroft. In each of those cases, the prosecutor undertook acts, namely seizures, searches, interrogations, that were taken before any decision had been made about whether or not to press forward with a warrant. And the prosecutor pressed forward with criminal proceedings. The Court reviews the facts of this case in the light most favorable to the plaintiff as it must on the summary judgment stage. Then at the time that Holmes served these warrants, he had, when he reviewed and edited the warrant affidavits, he had made no decision about whether or not to proceed with forfeiture proceedings. The last reason that absolute immunity should have been denied in this case is that the Supreme Court has said in Kalina and Buckley and Burns and Briggs that judges are not permitted or authorized to create immunities that were not present at common law. Here, defendants had the burden of proving that they were entitled to absolute immunity, and they've cited no common law tradition supporting absolute immunity for the service of a pre-forfeiture seizure warrant. This reason, this should have been dispositive as well. Now, I just want to mention the other two defendants before I move on to the second issue, which is class certification. Mr. Goddard is only entitled to qualified immunity in this case for the same reason that Mr. Holmes is entitled to qualified immunity. These warrants were investigative in nature. He was informed about these warrants by Western Union representatives, including Fred Niehaus, and as well as his chief of staff, Mr. Walsh. They were seizing money without regard to any particular money transfer, yet he ratified the warrant program. He allowed it to continue. He refused to return class members' money. Now, Western Union is not a party to this lawsuit. Pardon me? Is Western Union a party to this lawsuit? No, Your Honor. They're not a party to the lawsuit. They're not complaining about the seizure? They did complain about the Sonora warrant seizure. Well, I meant they... I'm not sure... They're not complaining in this case? No. Eventually, they grew tired, I believe, of the issue, and after trying to work things through diplomatically with the State of Arizona, they ended up filing a lawsuit, which, of course, was taken up to the Arizona Supreme Court. I'm not sure why Western Union... You know, the answer to your question is they're not a party. But they did testify that it had a... the warrant program had a significant... I mean, the warrant runs against Western Union, right? I'm trying to understand how your clients have an interest. I see what your question is now. I mean, if they have a beef, they turn money over to Western Union. I mean, let's just make it clear. Sure. Why isn't their claim against Western Union to say, hey... Give us our money back? Yeah, give us our money back. Okay, because... I don't know about that potential claim that they could have brought, but let's be clear about the interest here. Under the contract that our clients had with Western Union, they had a right to reclaim their money at any time. Until the money was paid out to the senders, the money was theirs. They had every right to ask for it back. Paid out to the recipients? Pardon me? Paid out to the recipients? Yes, Your Honor. Until it was paid out to the recipient, the senders had every right to demand it back. Western Union was just a carrier, right? They were holding the money for the senders until it was delivered to the receivers. They had a perfectly legitimate property interest that was invaded and that was seized. Their money was seized. Well, I'm trying to understand this. Why can't they now go to Western Union and say, hey, we sent you money. Give us our money back. Western Union doesn't have the money. The State of Arizona doesn't. Well, they've got other money. The fact that Western Union is asked to turn over money by the State of Arizona, your client can say, well, that's of marginal interest to us. We gave you money. We now want our money back. You dispose of our money in a way that's not consistent with our contract, so we want our money back. Why isn't that their remedy? And whatever disputes Western Union has with the State of Arizona for taking money that it, Western Union, had in its possession, that's between Western Union and the State of Arizona. Why aren't your clients, whatever complaint they have, why isn't that probably directed to Western Union? Have they asked for the money back? Have our clients asked for their money back from Western Union? I'm not sure. I don't know if that's a part of the record. I don't know. I don't believe so. But the reality is, Your Honor, that like many cases, plaintiffs are able to bring claims against various actors. And just because they may have contract claims against Western Union doesn't mean that they also don't also have Fourth Amendment Commerce Clause claims against these defendants. Well, but this is where I'm having some difficulty. Arizona enters an order that requires Western Union to turn over certain money that it has, right? You know, that's sort of a burden on Western Union for sure. But it's not like bullion or something where it's sort of marked with your client's name. It's not like a diamond ring or something that belonged to mom. This is money. And if Western Union is asked to turn over money, they say, okay, we turn it over, we don't turn it over. They still have an obligation to your client. I don't see how your client is affected by that order since its rights are against Western Union. They can get their money back. They can sue Western Union for noncompliance with the contract that they have entered. I mean, they pay them certain money. I'm sure that Western Union would be able to come up with a number of defenses to that breach of contract claim, one of them potentially being impossibility. I'm not sure. I haven't thought those issues through. But let me be clear. That was our client's money that was seized by the State of Arizona. Let me give you an example with respect to Mr. Torres. As you can imagine, you know, when he found out his money was seized, he was very upset and the recipient was very upset because she was expecting to receive that money. As a result, Mr. Torres put a check in the mail and sent it off to the intended recipient. Now he's had to pay $1,000 twice because Arizona took his money in the first place. You know, the reality is here, Judge, that we have sued the people most responsible for this act, the people who took the money. That's the State of Arizona. And regardless of what other claims we have, I don't think that that encumbers in any way and under any other case law our right to proceed against the State of Arizona, and that certainly these aren't arguments that I don't believe that the State of Arizona has raised in their brief. Now, Judge, we're running low on time here, so I do want to touch base on the class certification issue because I think it is critical. All of the warrants in this case required seizure based on the same four general criteria. There were minor and irrelevant variations across the board, but the general nature of the four criteria, the complete absence of any individualized suspicion, never changed. Mr. Holmes never knew whose money he was taking until after it was detained, and he had no information that any particular money transfer sender or receiver was associated with criminal conduct. Despite these common facts, the district court denied it. Is it any different than agricultural inspection stations? You know, trucks pass. I don't think Nevada has them, but I'm pretty sure Arizona does, and perhaps California. I think there's one on the border of Nevada and California because I think I've passed that. So there you are in your vehicle or in your truck transporting produce, let's say from Nevada to California. It looks just like a regular shipment. There's nothing suspicious about it. They can just say pull over. We want to look in the back and see whether you're carrying any legal fruits. No individualized suspicion, and open it up. And if they see what they think is individualized, I'm sorry, whatever it is, I don't quite know what agricultural people look for, but if they see something. Like some kind of checkpoint seizure. They can just take it. You know, they don't let it go past the border. How is that different from this? Where we say, look, we've got this stream of commerce, and we know there is something noxious and dangerous going in the stream of commerce, so we're going to put a stop to it, and once in a while require people to justify the legality of what they're doing. How is that different from the agricultural inspection station? Right. Well, a couple of responses to that, Judge. First of all. And then you better save time for your main argument, because it's what's going to decide the case. Pardon me? The class action, which is what the big issue is. And you're not going to have much time left if you don't get to that. I'm sorry. Which argument are you referring to? Class certifications. Yes. And I think that Judge Kaczynski's question is directed at this. But, you know, what your question is is whether or not this is a legitimate way of seizing property. But, again, that's a merits question, right? That's whether or not the Fourth Amendment was violated. We'll get to that, you know, if the case can proceed. But the question is the same for every single class member. In other words, whether or not it is true that these are just like checkpoint seizures. Now, we'll contend, of course, that these were not like checkpoint seizures, because the default rule was every money transfer is detained, regardless of whether or not somebody calls up the number. But the fact of the matter is that whatever was in the warrants, whatever was in the warrant affidavits, didn't matter because it all included mere profile evidence. There was no reason for the district court to have to make individualized determinations about whether or not the information in the affidavits supported probable cause, because none of it included any information about any particular sender or receiver of funds. The Fourth Amendment issue could have been resolved on a class-wide basis, because either profile evidence is sufficient to establish probable cause or it is not. The district court also declined to certify the Fourth Amendment claims based on individualized damages determinations. But, again, this is an issue that the Ninth Circuit has ruled on time and time again and said that individualized damages determinations do not defeat predominance under Rule 23b-3. In this case, like most cases, like many class action cases, the efficiencies that would have been gained by class-wide adjudication of the liability claims would have far outweighed any individualized determinations associated with individualized damages. Now, I see I only have a few minutes left. I'd like to reserve the rest of my time. I would like to answer one more question, which is, assuming that we agreed with you on the question of absolute immunity, what about the question of qualified immunity? Can we decide that at this point? Well, it should be ruled in our favor, because we've appealed. Well, the question is, should we decide it or should it be remanded to the district court? Did anyone raise qualified immunity in this appeal? We move for summary judgment on that defense. And the district court, you know, never reached the merits of that summary judgment motion because it granted absolute immunity in favor of the defendants. But on appeal, has anyone briefed the question of qualified immunity? We briefed it in our opening brief, and the defendants didn't respond to it. I don't think it's been adequately briefed, because only one side has briefed it. We believe that the Fourth Amendment rule here is quite clear. Well, let's suppose that we thought that the Fourth Amendment rule was clear. What's the principle case that would advise them that these kinds of broad in rem warrants was clearly established? Well, I think it's close enough to Ibarra v. Illinois and Marks v. Clark. You know, were those cases in rem warrants? No. But I don't believe that there is any legal distinction to be made about whether or not a person is searched or whether a property is seized. You must have individualized suspicion that the person or property at issue is involved in criminal conduct. So I think that the case law was abundantly clear at the time. I reserve the remainder of my time. Thank you. Thank you. We'll hear from the State. May it please the Court. David Weinsweig on behalf of the Appellees. Absolute immunity protects a civil forfeiture prosecutor from liability for his actions in persuading five independent neutral judges that probable cause existed to seize and forfeit wire transfers. Now, plaintiffs raised three arguments that absolute immunity would not apply here. And the first was that Mr. Holmes, the prosecutor, served these warrants. And I would say that that argument is misplaced and confusing. What happened here, what the record reflects, is Mr. Holmes asked his secretary to fax a copy of a seizure warrant that Western Union was expecting and also to drop a copy in the mail. That function doesn't turn Mr. Holmes into an investigator. Those are, as this Court found in Radcliffe, duties that are incidental to that of a prosecutor. Now, things would be quite different. I'm sorry. Service of pleadings is a function of a prosecutor? I thought service is done by service of process agents or by marshals or sheriffs or people like that, isn't it? Your Honor, I don't think service is something that you need a law license to. Do criminal complaints in Arizona get served by the DA? Does the DA go to somebody's house and say, hey, here's a criminal complaint? Don't they usually send the police or the sheriff to service a criminal complaint? Certainly in the civil context of serving a complaint. No, I said criminal. Did you hear the word criminal? Criminal, I think that that's probably a fair assessment, that a prosecutor will. This was a question. Do the prosecutors go out and serve criminal complaints? It's not a prosecutorial function to. Okay, so why isn't this, you know, it's something that's collateral to and precedes a prosecution. Why isn't this exactly the same, the service of the warrant? I would disagree with the first point, that it precedes a prosecution. In the civil forfeiture context, in order to get that warrant hours before it was issued or maybe the day before, Mr. Holmes had his prosecutor hat on and had to establish probable cause in an individual. Do you have a picture? I mean, how do we know he had his prosecutor hat on? Is this on his Facebook page? Well, I don't know if that's in the record, so I'd have to go off. But so what happened here is Holmes established probable cause in a courtroom, which is really what absolute immunity looks on, looks to. It turns on, was this a prosecutor or an investigator? Was it intimately connected to the courtroom? And the reason that's so important is because an independent arbiter is in the room to police misconduct, prosecutorial misconduct. Was Mr. Holmes involved in obtaining the warrants from the judge? Mr. Holmes signed the pleadings that sought relief, and he yet. And those pleadings were then taken to a judge who approved the warrants? Correct. And then he just served the warrants after the judge had approved them. So the warrants he's serving here have been previously approved by a judicial officer? Correct. And the warrants say both seizure and forfeiture. So probable cause was established. Now, what I was going to say is this would be quite different if Mr. Holmes was accompanying a SWAT team as they descended on a perpetrator's house to execute a search warrant, guns ablazing, and he just wanted to get his thrills. But I submit that that's quite different from buzzing your secretary and saying, could you fax a copy of this to our contact who we have a continuing relationship with? And I would also, I mean, my understanding of plaintiff's claim is that you have warrants that were issued without probable cause. I'm just trying to understand. There were individual warrants issued for each seizure? Correct, Your Honor. But there was an initial order warrant that told Western Union don't transfer any money, right? Every, no, every seizure. How does he know that there was such a transfer?  These were very similar to anticipatory warrants that the U.S. Supreme Court has said are constitutional if you have probable cause. I'm not asking for legal authority. I'm just asking for facts. I'm trying to understand how the process worked. Did Mr. Holmes know that Mr. Torres had sent money before he went to get a warrant? No, Your Honor. Okay. So this was long, this was an order, some sort of order or warrant or whatever, that was served on Western Union long before they ever heard of Torres? I wouldn't say long before. These were a series of successive seizures for finite periods that were received and executed not contemporaneously. They had never heard of Torres or of any of the other people that were covered by the warrant. This all happened at some point in time much earlier. And what it told Western Union is if anything comes in, you stop it and give it to us. The warrant, I would agree, does not say the name Torres. I would submit it doesn't have to. The burden of proof. I'm just asking for facts. I'm trying to understand the process. I don't know why you're arguing with me. Yes, Your Honor. Oh, no, no, I'm not. I'm trying to understand how this works and make sure I have it in front of me and you're arguing with me. Is my understanding wrong? They issue a warrant and they tell Western Union this is long before there's anything, any transfer, say anything comes in, matches the description, you hold on to it, and we lay claim to it. My answer is a qualified yes. Well, why don't you just say what the procedure is? Yeah, explain the procedure. They send a warrant. I mean, they get a subpoena. Right, they get a warrant. There are 18 of these subpoenas. And they apply to all transfers going from X, Colorado, whatever, to Arizona or to Western Union in an amount of more than $500. That's what they know. They've never heard of Torres and probably never heard of the first plaintiff. All they do is say every check that's over $500 you seize. I would agree, Your Honor, that Mr. Torres' name would appear nowhere. Is that a correct description of what happens? Every check of over $500 coming from Colorado, as an example, you seize. It wasn't uniform, but that's what you're identifying is the criteria for seizure, and those were criteria. They tell them. They tell them every check over $500, as an example. Correct. Correct, as an example. Okay. So that's the procedure. Those are the criteria in the search warrant, yes. Okay. Search warrants have been prepared by somebody else. Those have been prepared by Arizona officials working on forfeiture claims. So those are law enforcement officials who are preparing the warrants. Is that correct? Who are signing the affidavits. That is correct, Your Honor. Okay. Was the warrant separate from the affidavit? The warrant. What's taken before the judge? What's taken before the judge is an application for a seizure warrant, which has Cameron Holmes as, quote, unquote, attorney for the state, and says we have probable cause. Look at what is attached here, too, which is. Who physically takes that before the judge? Physically, I would think the Attorney General's office. Did Holmes personally take those? I don't believe he personally took them. Were they taken by an attorney? I don't know. Could they have been taken by an officer? I've seen somewhere in the record that an officer went so that if the judge had questions about the affidavit, the investigative portion that. But your answer, I would suspect, to Judge Barbee's question is you don't know whether Holmes went, someone from his office went. You don't know who went before the judge. Holmes did not go before the judge. He authored the application for seizure warrant that says attached here, too, is the probable cause, as gathered by real police officers. He wasn't in the field knocking on doors. But he has signed the application for the warrant. He signed, yes, the application for the warrant as the attorney for the state. Are the applications for the warrant in the record? They are. He didn't sign as a percipient witness, which was the critical point in Kalina. And the reason Kalina says we don't have absolute immunity was not because something was essential or inessential in the process. It's because you had a prosecutor who was attesting to the facts that were leading to the prosecution. Here, Mr. Holmes was not a percipient witness. He was an attorney with a client who convinced five separate independent judges that probable cause existed for these warrants. And if I can add, three court of appeals judges, it was overturned by the Supreme Court, but not on probable cause, agreed that there was probable cause. But my last point on service was I don't understand, well, as I read the complaint, the complaint complains about warrants issued without probable cause. So if what plaintiffs are really saying is, well, if a police officer had just faxed that or dropped it in the mail, we'd be okay. I submit, one, I don't see the connection, and I don't think that's a terribly strong claim. I don't see how that harmed them, the identity of the person faxing or mailing. The second point plaintiff raised on absolute immunity was the issue of whether an indictment or a complaint had issued. And, again, I would say that's not terribly helpful because the absolute immunity cases talk about complaints and talk about indictments as a shorthand to show whether police officers continue their hunt for probable cause as any money or the price of admission for probable cause to get into a courtroom, or whether or not they already have that evidence. And in the forfeiture context, what you had here was that evidence had been compiled and had been submitted to five separate judges for purposes of this class who had signed off on probable cause both as to seizure and forfeiture. If you look at the seizure warrant, they don't just say go ahead and seize. They say forfeiture is authorized. And the excerpts of Record 165, if the court is interested. So the seizure had no investigative purpose here. The seizure was an in rem proceeding to bring what is property before the court so they can adjudicate. What constitutes a seizure? From what I understand, it was self-executing that once the warrant was sent to Western Union, Western Union would hold liars that met the criteria in a queue. And then after the warrant period expired. I wouldn't know about these things until wires came in that matched the warrant, right? So why is that investigated? Why isn't that sort of identifying suspects? I don't know suspects at all before at the time the warrant is issued. Why isn't this just a way of identifying suspicious activity? Well, Your Honor, in the in rem. I mean, it would be different if you knew, oh, Torres is about to have a wire transfer, and you go in and you say, hey, when Torres transfer comes in, put a stop to it because we're going to seize it. But that wasn't the case, right? This was a way of identifying things that Arizona otherwise did not know about. I would disagree, Your Honor. The seizure warrant that was issued authorizes forfeiture. And the evidentiary material submitted to get that warrant, upwards of 80 pages, would spell out from A to Z the business and banking practices of what are called coyotes operating on the southern border. And what you had here. If you went through those 80 pages, would you be able to come up with Torres's name? No. You wouldn't be able to come up with Torres's name until that wire transfer came in and it matched the requirements. Correct, Your Honor, which is no different than an anticipatory search warrant. When is the decision to forfeit the particular checks made? You've got a whole series of checks, some of which match the profile, some of which may show criminal activity, some of which don't because people call in and say, what are you doing with my grandmother's check? And then you say, fine, we'll turn it over to somebody who will give it to your grandmother. And that one is not going to be forfeited. The decision to forfeit is made after you collect everybody's checks. And then you pick out the ones you're going to forfeit. I would disagree, Your Honor. The state moved for a seizure warrant based on criteria that would seize wire transfers that met the burden required for forfeiture. As well as others. Other checks. You don't deny it. I do not deny that. You collect a lot of checks, some from guilty people, some from innocent people. And I'm not saying that's wrong, but that's what you do. You collect all those checks. And at some point after you get them, you make a decision as to which to forfeit. It may say on the warrant for this and for forfeiture. But you don't intend to forfeit everybody's checks, only the guilty ones. Your Honor, I would disagree. I think what you're referring to is the call center phase. After the seizure. But that was a mitigated phase. That was. That's a phase that says we're not guilty. As opposed to the others. This is property of ours, and the government has no reason to forfeit it. That you find out at the call center phase. Well, the state had authority to forfeit. And in, I mean, I think always would forfeit. Here what you had is a mitigated phase to reduce or alleviate the burden on commerce. Fully understanding that you might have the exceptional innocent wire. And so this was really, I mean, I don't want to sound like I'm what you'd call a homer in sports. But this is good government. Responsive government. I mean, if you accept plaintiff's argument, you're incenting a dogmatic, inflexible prosecutor who better not pivot and look back because he's lost his absolute immunity. What you have here is a prosecutor who established probable cause to forfeit and could have done that right away. But, and I shouldn't say the prosecutor had any role in the call center because he never set foot in it. He didn't train any of those calls. But that was part of the process, a call center, to solicit calls and see if you could alleviate the burden on commerce. So I don't want to say that's good government. There was no interest. It was only to alleviate the burden. There was no interest in seeing that you didn't forfeit the property of innocent people. I would think that was one of the reasons that you would set up the call center because you did want to, I assume, with this fine prosecutor, that you did want to separate the innocent from the guilty. Well, I disagree, Your Honor. I mean, you didn't want to separate the innocent from the guilty. You wanted to forfeit their property also. The purpose of the call center was not investigatory, which I think is the important point. When plaintiffs cited KLM and they said this is on all four points, if I could explain and give a hypothetical, I know that attorneys aren't supposed to be the ones giving hypotheticals, but here, let's say this is what happened. You had a seizure for forfeiture, and you had a call center set up, and you had Holmes walk in and say, all right, guys, by the way, there's a rumor that these coyotes are starting to get into sex trafficking. Could be totally wrong on that. Toss in a question or two. Let's brainstorm. If something comes up, we'll go for it. If not, what's to lose? Those are new and different charges that are not connected with the probable cause as determined, again, by five separate detached judges. And that's what KLM was, was a prosecutor, and I see my time is out. I don't want to. But a prosecutor who did just that, issued a search warrant on a universe of issues, asking for this and this. But only this part dealt with what had been brought to the court with probable cause, the indictment. The other part was just imagination. Let's see if we can find the sex trafficking crimes. What the Ninth Circuit says is you're protected by absolute immunity as to this half, that relating to what probable cause has been provided, you are not protected as to your imagination in finding new and different claims. With that, unless the Court has any more questions, I would ask that the Court affirm. Thank you. I think you have two minutes left for rebuttal. A couple of points. First of all, I want to clarify a question that Judge Bybee asked. The affiance were the ones that took the applications to the judge. It was not Mr. Holmes. That's excerpts of Record 220. Okay. But did Mr. Holmes sign the application? Yes, Your Honor. Okay. So Holmes assigned the application. The evidence in support of the application are the affidavits of the law enforcement officials. The law enforcement officials go to the judge presumably because if the judge has got any questions, Holmes isn't terribly useful on this. These are the guys who are going to be useful on answering his questions. I believe that's the reason why. The other point of fact is that this is the first time I've heard about the Secretary faxing the warrants. The parties stipulated to this fax so that we wouldn't have to deal with this later. Excerpts of Record 276, there's a stipulation between the parties. Holmes served the warrants, and that should be the end of this case. What difference does it make who served the warrants? Because the Supreme Court has crafted this absolute immunity doctrine exceedingly narrowly. It's only for acts that are to be done by a prosecutor in the role of prosecutor, not for other acts that are not prosecutorial either before or after charging the statute. But the application for the warrant which preceded this was signed by Holmes. The warrants that are issued by the State trial judges show both Goddard and Holmes up at the top as the State's lawyers. It was the lawyers who were prosecuting this. Okay. So at that point, the court that has issued the warrant has certainly treated them as the prosecutors and not as witnesses or something else other than the attorneys for the State. Okay. Insofar as they applied for the seizure warrant, right? Right. At that point, once the warrant's issued, this is largely a ministerial function to serve them. But in an in-rem proceeding, that is the way that you initiate a lawsuit. It is the seizure of the thing itself, of the evil thing. I understand. But one place that I may be disagreeing with you is that, again, we go back to I think what you're saying is having jurisdiction of the property, seizing the property is a necessary prerequisite to a forfeiture proceeding. And I think my response to that before was that's not the standard for determining whether an absolute immunity applies. A necessary step to a criminal prosecution is not the standard, and there are many necessary steps prosecutors may take in the course of deciding whether or not to bring a criminal proceeding where they are not entitled to absolute immunity. We have absolute immunity going before a grand jury to seek an indictment, right? That is true, Your Honor. Or if you don't go by indictment, if you go by criminal complaint. That's the Kalina case, yes. How is this different? A couple of reasons. Again, serving a warrant is a police function, and we know that there are actually two. Excuse me. Sorry. I think it just probably points out the actual process of serving it. I mean, you have an indictment. Usually indictments are served by having the police knock down your door and come and arrest you. But criminal complaints, it could be sort of lesser offenses, traffic offenses, and for whatever reason they have to issue a complaint rather than get you on the ticket. Sometimes they just send it to you by mail, right? So the process of actually serving a criminal complaint is ministerial, but the swearing out of the complaint, why isn't that prosecutorial? Okay. I believe the question is, is your question whether or not there should be absolute immunity for the ministerial function of faxing the seizure warrants? Well, what I'm saying is let's take the actual ministerial act of serving out of the process. Okay. And do you agree that just going in to get the warrant, as Judge Riley described with their names on top, that is subject to qualified immunity? I don't think that the Supreme Court's cases are clear, and here's why. The Burns case, of course, appearing in front of a judge, we know that's entitled to absolute immunity. But we also know that before a decision has been made, okay, to actually initiate forfeiture proceedings, and again our contention is that never happened until they know which money they had for potential forfeiture, that we're still in the investigative phase. And so that would be like a prosecutor in KRL seeking a search warrant for potential crimes that may or may not be charged later on. So that's why I would submit to you that in this case the applications were not entitled to absolute immunity, because, again, no decision yet made to prosecute. Last point, I know I'm running over on time. The defendants said that they could have, Mr. Weinzweig said that, could have forfeited all the money because the warrants, the seizure warrants said, these are seizure warrants for forfeiture, they're eligible for forfeiture. But you have to remember the warrants also provided that you couldn't go forward with forfeiture unless they instituted this point of contact call center. The call center was included in the warrant as a way of ferreting out the legal from the illegal, and I think in that way it even further indicates that these warrants were investigative in nature. I know my time is up. Thank you. Thank you very much. This argument stands submitted. We thank counsel for an interesting argument.
judges: Kozinski, Reinhardt, Bybee